1
2
3
4
5
6
7          IN THE UNITED STATES DISTRICT COURT

8          FOR THE EASTERN DISTRICT OF CALIFORNIA

9    PERRY LEE SISCO,

10              Plaintiff,              No. CIV S-05-0867 GEB JFM P

11         vs.

12   STATE OF CALIFORNIA, et al.,       ORDER AND

13              Defendants.             FINDINGS & RECOMMENDATIONS

14   _____/

15            Plaintiff is a state prison inmate proceeding pro se with a civil rights action

16   pursuant to 42 U.S.C. § 1983.  On December 13, 2006, defendants Butler, Torruella, Gaitonde,

17   Cardeno, Dazo, Martinez, Davis, Stahl, Navarro, Milson, Grannis, Pagala, and Lightner filed a

18   motion for summary judgment.[1]  Plaintiff has filed an opposition to the motion.

19            Plaintiff contends he "is entitled to further discover the circumstances and

20   procedures surrounding the purported 'protected' actions of defendants."  (Opp'n. at 2.)  Plaintiff

21   states he "intends to depose expert witnesses, the defendants and their superiors; . . . to demand

22   production of the work schedules of the defendants during the time of the alleged incident; the

23   policies and procedures of the prison and the medical staff during the time of the alleged

24   _____

25        [1] On April 19, 2007, the court issued findings and recommendations recommending the
     dismissal of defendants Beruth, Schmidt, Spears and Falconer based on failure to timely effect
26   service of process.  Fed. R Civ. P. 4.  The remaining defendants were dismissed by the district
     court on August 31, 2005.

1  incident." (Opp'n. at 3.)  "Without the opportunity to further discover this information,

2  plaintiff's ability to put on his case would be severely compromised." (Opp'n. at 5.)

3      Rule 56(f), Federal Rules of Civil Procedure, provides:

4      Should it appear from the affidavits of a party opposing the motion
    that the party cannot for reasons stated present by affidavit facts

5      essential to justify the party's opposition, the court may refuse the
    application for judgment or may order a continuance to permit

6      affidavits to be obtained or depositions to be taken or discovery to
    be had or may make such other order as is just.

7

8  Id.  In order to obtain a continuance or denial of the motion to allow further discovery, plaintiff

9  must file a declaration that demonstrates (1) facts establishing a likelihood that controverting

10  evidence may exist as to a material fact; (2) the specific reasons why such evidence could not be

11  presented at the present time; and (3) the steps or procedures plaintiff intends to use to obtain

12  such evidence. Fed. R. Civ. P. 56(f); see Terrell v. Brewer, 935 F.2d 1015, 1018 (9th Cir. 1991).

13  Plaintiff must also explain how such a continuance would enable plaintiff to rebut defendants'

14  allegations that there are no genuine issues of material fact.  Tatum v. City & County of San

15  Francisco, 441 F.3d 1090, 1101 (9th Cir. 2006).

16      The subject of this litigation pertains to injuries plaintiff sustained in a prison riot

17  that occurred on October 15, 2003.  Plaintiff filed the complaint on May 2, 2005.  The discovery

18  deadline was first set for April 28, 2006.  (January 12, 2006 Order (Docket No. 24).)  At that

19  time, the court also issued a discovery order setting forth the applicable rules governing

20  discovery in this action.  (January 12, 2006 Order (Docket No. 25).)  On July 28, 2006, the court

21  issued a revised scheduling order and the discovery deadline was continued to October 6, 2006.

22  (Id.)

23      Plaintiff's opposition is not signed under penalty of perjury and plaintiff did not

24  provide a declaration in support of his request for continuance or in support of his opposition to

25  the motion.  While plaintiff has identified certain items of discovery he says he  would pursue

26  should the court reopen discovery in this action, plaintiff has failed to explain why he has failed

to propound such discovery to date.  In addition, plaintiff has failed to demonstrate, by

declaration, that he "cannot for reasons stated present by affidavit facts essential to justify [his]

opposition."  Fed. R. Civ. P. 56(f).  Plaintiff has also failed to explain how the work schedules

and/or policies and procedures would assist him in presenting his case.  Plaintiff has not

identified what evidence he would adduce through deposition testimony.  Rather, plaintiff states

broadly "Defendants' statement of facts, controverted by that of the plaintiff, is fundamentally

flawed by misrepresentations, misdescriptions and underdescriptions[,] all of which create triable

issues of fact."  (Opp'n. at 5.)  Plaintiff does not specifically identify what those

misrepresentations, misdescriptions or underdescriptions are.  Finally, plaintiff has not explained

how such a continuance would enable him to rebut defendants' allegations that there are no

genuine issues of material fact.

This court finds that plaintiff has had ample opportunity to conduct discovery.

See Stitt v. Williams, 919 F.2d 516 (9th Cir. 1990)(where party had one month between

expiration of discovery stay and summary judgment hearing to take and review depositions,

denial of continuance upheld).  Moreover, plaintiff has failed to demonstrate that further

discovery would provide him evidence sufficient to defeat defendants' motion for summary

judgment.  Plaintiff's request for 56(f) continuance is denied.  The court turns now to the motion

for summary judgment.

UNDISPUTED FACTS

1.  Plaintiff has two lightning bolt tattoos on his left arm and has claimed to be a

member of a prison disruptive group known as Supreme White Pride (SWP), but prison officials

have not validated him as a gang member.  (Defs.' Ex. A, Attach. 1,  at 23.)

2.  On August 5, 2003, plaintiff told reception center medical staff that he had

been robbed on July 5, 2003, and that his head had been split open.  (Defs.' Ex. A, Attach. 2

[Marley Decl. and attached medical records], at 1-2 [Docket No. 38-2 at 30-31].)  He said he had

occasional vision problems in his right eye and frontal swelling.  (Id.)  He was seen on August 7

1  and told the doctor at that time that he had lost consciousness when hit on the head a month

2  before.  Following examination, the doctor diagnosed post-concussion headaches.  (Id. at 3.)

3        3.  On October 15, 2003, during the mandatory 3:00 p.m. yard recall on the main

4  exercise yard at FSP, Officer Gibson saw two White inmates (Small and McNabb) and two

5  Hispanic inmates (Flores and Perales) fighting with each other about 10 feet in front of the yard

6  shack.  (Defs. Ex. B, Attach. 1 [Banke Decl. and attached incident report excerpts],

7  at 9-10.)  Officer Gibson ordered the inmates to get down, and they complied.  (Id.)  He then

8  sounded a Code 1 alarm.  (Id.)

9        4.  When an incident occurs involving inmate violence, the first staff member who

10  observes it determines the level of response needed to control the incident and calls a "code" that

11  corresponds with that level of response.  (Defs.' Ex. C [Elledge Decl.] ¶ 2.)  There are three codes

12  that can be called ranging from Code 1, the lowest level of response, to Code 3, the highest.  (Id.)

13  Each code prompts a progressively larger number of staff to respond.  When a Code 1 is called,

14  staff respond to the incident, while additional staff are deployed to staging areas in the event an

15  incident escalates and a Code 2 is called.  (Id.)

16        5.  Plaintiff had been walking in the area where the fight started and squatted

17  down when he heard the Code 1 alarm and the order to get down.  (Amend. Compl., p. 4.)  When

18  the alarm was sounded, plaintiff responded squatted on the ground.  (Id.)

19        6.  Correctional Sgt. Martinez, the yard sergeant, responded to the Code 1 alarm

20  by going to with other officers.  (Defs.' Ex. B, Attach. 1, p. 12.)  After Officer Gibson told him

21  what had happened, inmates Flores, Perales, and McNabb were handcuffed and taken to the

22  custody complex; inmate Small was escorted to the medical clinic with a bruise and swollen area

23  below his left eye.  (Id.)

24        7.  About 15 minutes later, inmates were told over the public address system to

25  remain down until staff cleared them to return to their housing units.  (Defs.' Ex. B, Attach. 1,

26  /////

1  at 12.)  Five minutes later, Sgt. Martinez started telling small groups of about 25 inmates to stand

2  slowly and return to their housing units.  (Id.)

3           8.  Five minutes into the process of moving the inmates off the yard, Sgt. Martinez

4  heard another Code 1 on his radio.  (Defs.' Ex. B, Attach. 1, at 12.)  He looked toward the yard

5  shack and saw that a group of approximately 20 inmates were fighting there.  (Id.)  He

6  immediately requested Code 2 backup and then heard someone on the radio requesting Code 3

7  backup.  (Id.)  Sgt. Martinez then went to the yard shack where Officer Gibson and several

8  cadets, including Cadet Officers Navarro and Milson, and other responding staff were located.

9  (Id.)

10          9.  Cadet Officers Navarro and Milson were assigned to accompany correctional

11  officers that day and observe them performing their jobs.  (Defs.' Ex. C [Milson Decl.] [DX C],

12  ¶ 2.)  Neither was cleared to use or carry weapons, and neither had a side-handle baton, pepper

13  spray, or other weapon that day.  (Id.)

14          10.  By the time Sgt. Martinez got to the yard shack area where the fighting had

15  resumed, the number of inmates fighting there had doubled, and inmates continued to fight as

16  Sgt. Martinez and Officer Gibson sprayed them with pepper spray to stop the fighting.  (Defs.'

17  Ex. B, Attach. 1, at 12.)

18          11.  Plaintiff, who was in the yard shack area, had been ordered to get up to go to

19  his housing unit; but, as he stood up, he heard a "Hispanic War Cry," and was struck on the back

20  of his head with a milk crate.  (Compl., at 9.)  Plaintiff fell to the ground, scraping his arms and

21  legs, and was then kicked around his head, face, and neck.  (Id.)

22          12.  Cadet Officers Navarro and Milson saw a White inmate, whom they did not

23  know and could not identify, get kicked in the head.  (Defs.' Ex. B, Attach. 1, at 17-19; Defs. Ex.

24  D, ¶ 3.)  The only thing Milson, who was not armed, could do was order the inmates to get down,

25  which they did.  Id.  (Defs.' Ex. D, ¶3.)

26  /////

13. Officer Meadows responded to the alarm at the yard shack area and saw inmate Paredes get off the ground and move toward a group of inmates on the ground. (Defs. Ex. B, Attach. 1, at 15-16.) When Paredes refused to comply with his order to stop, Officer Meadows fired a baton round that hit Paredes, causing him to drop to the ground. (Id.) Officer Meadows then saw inmate Bailey get up and move toward another group of inmates on the ground. (Id.) Bailey also did not comply with an order to get down, and Officer Meadows fired another baton round that hit Bailey on the back left shoulder, causing him to get down. (Id.) Bailey later told plaintiff that he was hit as he threw himself over plaintiff to protect him. (Compl., at 9.)

14. While the fight at the yard shack was taking place, other inmates got up and began fighting on the baseball field. (Defs.' Ex. B, Attach. 1, at 1-6.) In all, approximately 100 inmates were involved in fights at various places on the yard. (Id.)

15. Officers eventually gained control by using hand-held batons, pepper spray, and baton rounds fired from launchers to gain control. (Defs.' Ex. B, Attach. 1, at 1-6.) When control was established, the inmates were handcuffed and moved from the yard. (Id.)

16. Plaintiff was on the ground, dazed and bleeding. (Compl., at 9.)

17. Medical Technical Assistant (MTA) Stahl was triaging inmates on the yard after the riot was controlled, but did not notice that plaintiff was bleeding, delirious, and slipping in and out of consciousness. (Compl., at 6.)

18. Plaintiff was taken from the yard to the medical clinic on a litter. (Compl., at 9.)

19. At the clinic, plaintiff claims that MTA Davis told Dr. Gaitonde that plaintiff was the inmate who had started the riot and that he had been found in a fetal position. (Compl., at 9.)

20. Medical records show that plaintiff was seen by MTA Beruth and Dr. Gaitonde around 3:50 p.m. the afternoon of the riot. (Defs.' A, Attach. 2, at 9.) Plaintiff said he

did not know what had happened. (Id.) Plaintiff had a swollen lip, two abrasions on the left

forehead, two abrasions on the left cheek, two abrasion on the left front shoulder, one abrasion on

the right knee, an abrasion on left elbow, an abrasion on right elbow, an abrasion on knuckle of

left middle finger, and an abrasion, bruise, and swelling on head behind right ear. (Id.) The

report noted that no dressing for the abrasions was applied and that plaintiff was released to

custody staff at 4:45 p.m. (Id. at 9, 21.)

      21.  Plaintiff was placed in administrative segregation that day pending

adjudication of disciplinary charges for participation in the riot because he had been found in the

area where the initial combatants had been at the beginning of the riot. (Defs.' Ex. A, Attach. 1,

at 12.) Plaintiff signed the notice that day. (Id.)

      22.  Plaintiff had a hearing on his administrative segregation placement the

following day, October 16, 2003. (Defs. Ex. A, Attach. 1, at 12.) Plaintiff claims that he told the

hearing officer that he was hurt and needed medical attention, but the officer laughed, told staff

to "throw" him back in his cell, and told plaintiff that they would contact medical staff. (Compl.,

at 10.  The officer who allegedly made the remarks is not a defendant. (Id.)

      23.  A psychiatric technician checked plaintiff on daily rounds on October 17, 18,

19, 20, 21, and 22, 2003. (Defs.' Ex. A, Attach. 1, at 19-20.)

      24.  Two days after the riot, plaintiff called for help and was told by an MTA who

was delivering medications that he could not help until a doctor had seen him, but the MTA gave

him some ibuprofen. (Compl., at 10 ( l. 25) & 11 (l. 2).)

      25.  On October 20, 2003, plaintiff signed a grievance, complaining that he had

been hit on the back of the head with a milk crate during the riot on October 15, that he had been

seen by a doctor, but was confused, dizzy, and in pain. (Defs.' Ex. E, Attach. 1 [Grannis Decl.

and attached grievance], at 1.) Plaintiff asked to see a  doctor for x-rays of his head and to be

found innocent of disciplinary charges filed against him. (Id.) The grievance was received by

the appeals office three days later. (Id.)

26. On October 22, 2003, Dr. Dazo saw plaintiff who complained that he had been hit on the head with a milk crate and had been unconscious in his cell for two days and wanted something for pain. (Defs. Ex. A, Attach. 2, at 4.) On examination, Dr. Dazo noted no objective findings for the reported symptoms; that plaintiff's eyes, ears, nose, and throat (EENT) were benign; and that no abnormalities were found after a review of his system; and that vital signs were stable. (Id.) Dr. Dazo's assessment was no residual physical or neurological abnormalities, and his plan was to offer reassurance. (Id.)

27. On October 23, 2003, a classification committee chaired by Warden Butler saw plaintiff for review of his administrative segregation placement pending adjudication of disciplinary charges for participation in a riot. (Defs.' Ex. A, Attach. 1, at 15.) During the hearing, plaintiff complained that he needed medical assistance for injuries sustained during the riot. (Compl., at 11.) Warden Butler was concerned and referred him to Dr. Torruella. (Id.)

28. Later that day, Dr. Torruella saw plaintiff who reported that a week earlier, on October 15, he was walking on the yard when an alarm bell went off, so he sat down. (Defs.' Ex. A, Attach. 2, at 10-11.) Someone hit him on the head with a milk crate. (Id.) Plaintiff did not recall getting up, but remembered being in a holding cell for six or seven hours. (Id.) Plaintiff said that his memory had improved since October 18 and that he remembered sending a letter to his mother and his girlfriend the following day. (Id.) Plaintiff reported that his head hurt behind his eyes and temples, that he had no change in vision, that his right ear canal hurt, that he became dizzy with movement, had full range of motion of his extremities, a normal gait, that he had pounding head pain, rated as 8 on a scale of 10, which was helped by Motrin with pounding, and that his neck was stiff and cracking and that the pain went to his spine when he tilted head to the left. (Id.) Dr. Torruella spoke with the medical technical assistant who had attended plaintiff for 15 minutes after the assault. (Id.) The medical technical assistant said that plaintiff reported having been kicked several times in the head when he was down and that plaintiff was aware of who he was, but not where he was, and that his pupils were equal, but sluggish, during that time.

(Id.) Following examination, Dr. Torruella noted that plaintiff was currently oriented times three; his head, eyes, ears, nose, and throat were normal (HEENT); his abrasions had mostly healed; he had full range of motion in the neck (FROM); he was clear to auscultation (CTA); his chest was clear; that he was negative for Trendelenburg; plaintiff's pupils were round, regular, and equal, and that they reacted to light, accommodation, and pupil size changes. (Id. at 11.) Dr. Torruella's diagnosis was head trauma syndrome with questionable loss of consciousness for two days, and that a jaw fracture or dislocation should be ruled out. (Id.) Dr. Torruella ordered an x-ray of the temperomandibular joint (TMJ) and an MRI of the brain. (Id., at 11, 22.) The x-rays showed no evidence of fracture or destructive changes of the mandible. (Id., at 27.)

29. Dr. Cardeno saw plaintiff later that day and found no gross neurological motor deficit. (Defs.' Ex. A, Attach. 2, at 11.) Dr. Cardeno told plaintiff that he would be seen the following week, or as needed, and that further diagnostic studies, including an MRI of the brain, would be done, only if needed. (Id.) Dr. Cardeno ordered Naprosyn, 500 mg., b.i.d. as needed for seven days and Robaxin, 750 mg., t.i.d. for seven days. (Id., at 22.)

30. On November 5, 2003, MTA Davis noted that plaintiff refused to be seen, but that he would be re-ducated. (Defs.' Ex. A, Attach. 2, at 12.) A week later, on November 12, plaintiff was seen by Dr. Dazo for follow up and review of his grievance at the first level. (Defs.' Ex. A, Attach. 2, at 12; Defs.' E, Attach. 1. Dr. Dazo noted no evidence of any residual effects of the head trauma and renewed the order for Motrin, 800 mg. b.i.d. for 30 days. (Defs.' Ex. A, Attach. 2, at 12.)

31. On November 20, 2003, plaintiff was released from administrative segregation. (Defs.' Ex. A, Attach. 1, at 22-23.)

32. On December 8, 2003, Dr. Gaitonde saw plaintiff who asked to have his ear checked. (Defs.' Ex. A, Attach. 2, at 15.) Following examination, Dr. Gaitonde's assessment was cerumen (ear wax) in the right ear which he ordered cleaned. (Id., at 15, 23.)

/////

33. On December 11, 2003, Health Services Appeals Analyst Falconer, denied plaintiff's grievance at the first level. (Defs.' Ex. E, Attach. 1, at 3-4.) The grievance was denied because, after review of the October 15, 2003 incident, medical staff had seen plaintiff on October 22 and 23, November 12, and December 8, and that plaintiff had refused an appointment on November 5, 2003. (Id.) The reviewer found that plaintiff had been provided appropriate care and that MRI of the brain was not medically necessary and would not be ordered. (Id.)

34. On December 31, 2003, Dr. Torruella noted that plaintiff's girlfriend had telephoned the Chief Medical Officer and reported that she thought plaintiff's eyes looked "funny" and asked that he be seen for possible retinal detachment. (Defs.' Ex. A, Attach. 2, at 16, 24.) Dr. Gaitonde saw plaintiff that day and found his vision to be 20/30 in both eyes and no signs of other problems. (Id.) Dr. Gaitonde ordered that plaintiff be seen by an optometrist as soon as possible to rule out a refractive error. (Id.)

35. On January 22, 2003, Dr. Peterson, the Chief Medical Officer, denied plaintiff's grievance at the second level. (Defs.' Ex. E, Attach. 1, at 5-6.)

36. On January 30, 2004, Dr. Torruella saw plaintiff who complained that he had blurring when reading print with both eyes that he thought were related to his head injury. (Defs.' Ex. A, Attach. 2, at 17, 25.) Plaintiff reported noticing the problem two to three weeks after the injury. (Id.) Plaintiff claimed that his vision was becoming worse and that he had red and green pixels in both eyes and twirling movements in both eyes when he turned off the lights that were not objective. (Id.) Plaintiff complained that his right ear continued to hurt and that he heard a sound when he burped. (Id.) He was not dizzy at the time, but reported having been dizzy in the past. (Id.) He reported continuing neck and back pain and that his girlfriend said he had a round ring around his cornea. (Id.)

In his objective findings, Dr. Torruella found plaintiff's pupils were round, regular, and equal, and that they reacted to light, accommodation, and pupil size changes. He
/////

10

1  stated there was "no heppers or anisocoria.[2]  Fundo exam.  Right ear loss of light reflex"  (Id.)

2  Following examination, Dr. Torruella's assessment was visual problems and a questionable right

3  middle ear pathology.  (Id.)  He ordered an audiogram and expedited eye examination.  (Id.)

4        37.  On February 3, 2004, plaintiff saw an optometrist who found no ocular

5  defects due to trauma and no signs of neurological problems.  (Defs.' Ex. A, Attach. 2, at 18.)

6  The optometrist's diagnosis was hyperopic astigmatism/presbyopia, but plaintiff declined a

7  prescription for eyeglasses, stating that he wanted "to buy sodas."  (Id.)

8        38.  On March 4, 2004, plaintiff referred himself for a mental health evaluation,

9  claiming problems with his ear and nose and that he was fearful and traumatized as a result of the

10  fight.  (Defs. Ex. A, Attach. 2, at 19.)  A psychiatric social worker diagnosed post-traumatic

11  stress syndrome with some paranoid ideation secondary to trauma of closed head injury.  (Id.)

12  No treatment or follow-up was ordered.  (Id.)

13        39.  Plaintiff paroled on March 24, 2004, before the audiogram was done.  (Defs.'

14  Ex. A, Attach. 1, p. 9.)

15        40.  Plaintiff claims that while he was on parole he told Parole Agent Leichner of

16  his medical problems, but that Leichner did not give him suggestions on where to get medical

17  care and did not give him his G.A.T.E. money.  (Compl., at 12.)

18        41.  Although plaintiff returned to prison a year later on May 6, 2005, as a parole

19  violator with a new term, he never returned to FSP again.  (Defs. Ex. A, Attach. 1, at 9-11.)

20        42.  On May 11, 2004, plaintiff claims that his grievance was denied at the

21  Director's level by M. Pagala, on behalf of Chief of Inmate Appeals Grannis.  (Compl., at 11.)

22  The grievance indicates that Facility Capt. Porter interviewed plaintiff at the Director's level and

23  that N. Grannis signed the denial.  (Defs.' Ex. E, Attach. 1, at 8-9.)  There is no evidence that M.

24  Pagala was involved.  (Id.)

25

26        [2]  Anisocoria is "[a] condition in which the two pupils are not of equal size."  STEDMAN'S
MEDICAL DICTIONARY 87 (25th ed. 1990).

1                                 SUMMARY JUDGMENT STANDARDS UNDER RULE 56

2                 Summary judgment is appropriate when it is demonstrated that there exists "no

3 genuine issue as to any material fact and that the moving party is entitled to a judgment as a

4 matter of law." Fed. R. Civ. P. 56(c).

5                 Under summary judgment practice, the moving party

6            always bears the initial responsibility of informing the district court
of the basis for its motion, and identifying those portions of "the

7            pleadings, depositions, answers to interrogatories, and admissions
on file, together with the affidavits, if any," which it believes

8            demonstrate the absence of a genuine issue of material fact.

9 Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the

10 nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

11 judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

12 to interrogatories, and admissions on file.'" Id.  Indeed, summary judgment should be entered,

13 after adequate time for discovery and upon motion, against a party who fails to make a showing

14 sufficient to establish the existence of an element essential to that party's case, and on which that

15 party will bear the burden of proof at trial.  See Id. at 322.  "[A] complete failure of proof

16 concerning an essential element of the nonmoving party's case necessarily renders all other facts

17 immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

18 whatever is before the district court demonstrates that the standard for entry of summary

19 judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

20                 If the moving party meets its initial responsibility, the burden then shifts to the

21 opposing party to establish that a genuine issue as to any material fact actually does exist.  See

22 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

23 establish the existence of this factual dispute, the opposing party may not rely upon the

24 allegations or denials of its pleadings but is required to tender evidence of specific facts in the

25 form of affidavits, and/or admissible discovery material, in support of its contention that the

26 dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

1   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

2   of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

3   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

4   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

5   return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

6   1436 (9th Cir. 1987).

7         In the endeavor to establish the existence of a factual dispute, the opposing party

8   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

9   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

10  versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

11  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

12  genuine need for trial.'" Matsushita, 475 US. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

13  committee's note on 1963 amendments).

14        In resolving the summary judgment motion, the court examines the pleadings,

15  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

16  any. Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

17  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

18  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

19  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

20  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

21  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

22  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

23  show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

24  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

25  'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

26  /////

On October 13, 2005, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

PLAINTIFF'S OPPOSITION

In his unverified opposition, plaintiff argues that the motion for summary judgment should be denied because the "complaint has stated facts sufficient to constitute a cause of action." (Opp'n. at 2.) After citing a number of court cases for various legal theories, plaintiff contends that defendants are "not entitled to summary judgment at this time as this statement sets forth specific facts showing that there are genuine factual issues necessitating a trial." (Opp'n. at 6.) However, plaintiff's opposition contains no specific factual allegations. Accordingly, the court turns to plaintiff's verified complaint to address the motion for summary judgment.

ANALYSIS

1. Failure to Protect

Plaintiff alleges defendants Warden Butler, Correctional Sgt. Martinez, and Correctional Officer Cadets Milson and Navarro failed to protect plaintiff from harm by failing to prevent or stop the assault on plaintiff.

The Civil Rights Act under which plaintiff is proceeding provides that

> [e]very person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The statute requires an actual connection or link between the actions of each defendant and the deprivation alleged to have been suffered by the plaintiff. See Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976). "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to

14

1   perform an act which he is legally required to do that causes the deprivation of which complaint

2   is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

3          The Eighth Amendment prohibits cruel and unusual punishments.  U.S. Const.

4   amend. VIII.  It is well established that the unnecessary and wanton infliction of pain constitutes

5   cruel and unusual punishment forbidden by the Eighth Amendment.  Whitley v. Albers, 475 U.S.

6   312, 319 (1986); Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97,

7   105-06 (1976).  However, neither accident nor negligence constitutes cruel and unusual

8   punishment, for "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that

9   characterize the conduct prohibited by the Cruel and Unusual Punishments Clause."  Whitley,

10  475 U.S. at 319.

11         In order to prevail on any claim of cruel and unusual punishment, a prisoner must

12  prove facts that satisfy a two-part test.  First, the prisoner must prove that objectively he suffered

13  a sufficiently serious deprivation.  Wilson v. Seiter, 501 U.S. 294, 298 (1991).  Second, the

14  prisoner must prove that subjectively each defendant acted with deliberate indifference in

15  allowing or causing the prisoner's deprivation to occur.  Id. at 299.  It is insufficient to show

16  mere negligence or error on the part of the defendant.  Id.

17         An inmate's health and safety are conditions of confinement subject to the

18  strictures of the Eighth Amendment.  Wilson, 501 U.S. at 303.  An injury to a prisoner's health

19  or safety "translates into constitutional liability" for the prison officials responsible for a

20  prisoner's safety when the deprivation suffered is sufficiently serious and each official had a

21  sufficiently culpable state of mind in causing or allowing the deprivation to occur.  Farmer, 511

22  U.S. at 834.  Where a prisoner alleges failure to prevent harm, he or she satisfies the "sufficiently

23  serious" requirement by proving the existence of conditions posing a substantial risk of serious

24  harm.  Id. at 834; see also Helling v. McKinney, 509 U.S. 25, 33-34 (1993).  However, a prison

25  official has a sufficiently culpable mind only where "the official knows of and disregards an

26  excessive risk to inmate health or safety."  Farmer, 511 U.S. at 837.  "[T]he official must both be

1  aware of facts from which the inference could be drawn that a substantial risk of serious harm

2  exists, and he must also draw the inference." Id.  Whether a prison official had the requisite

3  knowledge of a substantial risk is a question of fact.  Id. at 842.  "[P]rison officials who actually

4  knew of a substantial risk to inmate health or safety may be found free from liability if they

5  responded reasonably to the risk, even if the harm ultimately was not averted."  Id. at 844.

6         In the instant case, plaintiff submitted no additional evidence in support of his

7  opposition, relying on his complaint.  Plaintiff's complaint is signed under penalty of perjury and

8  includes as exhibits copies of medical reports of injuries, physician's orders and progress notes,

9  incident reports, administrative segregation unit placement notice, an optometry worksheet and

10  the May 11, 2004 Director's Level Appeal Decision.

11         Plaintiff alleges defendant Butler should have known that a riot would occur and

12  failed to prevent it.  (Complaint at 2, 11.)  However, plaintiff has provided no evidence in

13  support of this theory.[3]  Plaintiff has not provided evidence that he was personally at risk that day

14  or that defendant Butler was aware that a riot was going to break out on October 15, 2003.

15         The court turns now to plaintiff's allegations against defendant Martinez.  In the

16  complaint, plaintiff states that on October 15, 2003, he was walking through an area known as

17  "Blood Alley" and noticed two Latino men and two Caucasian men fighting.  (Compl. at 8.)  At

18  1456 hours a "Code 1 Yard" was called.  (Id.)  Then plaintiff heard an order to get down and he

19  squatted near the ground.  (Id.)  A controlled yard recall was started at about 1500 hours and

20  correction officers from the yard shack began escorting inmates back into custody, and to the

21  clinic, creating a situation where there were too few guards on the yard to maintain order.  (Id.)

22

23         [3]  Plaintiff did provide a copy of an incident report that was signed by Correctional Lt.
Clayton and dated October 15, 2003.  (Compl., Attach. E.)  That report bears the name of

24  Warden Butler in the "authorized signature" box, but does not bear Warden Butler's signature.
(Id.)  Defendants provided a complete copy of this incident report which bears Warden Butler's

25  signature.  (Defts.' Ex. B, Attach. 1, at 1-6.)  However, Warden Butler signed the form on

26  November 6, 2003.  (Id.)  Because the review occurred after the incident, it does not demonstrate
that Warden Butler knew of and disregarded an excessive risk to plaintiff's health or safety.

1  Plaintiff then heard the correction officers say to go back into the building.  (Id.)  Plaintiff states

2  that once he stood up to enter the building, he "heard a 'Hispanic War Cry' and was suddenly

3  struck from behind, in the back of the head, and fell to the ground unconscious." (Compl. at 9.)

4  Plaintiff alleges that

5          [i]t was later ascertained that several Southern Hispanics had
        attacked [him] with a milk crate.  [He] fell forward, scraping [his]

6          arms and hands and was repeatedly kicked in and around [his]
        head, face and back.  A second and much larger riot, consisting of

7          approximately 100 inmates . . . had started.

8  (Compl. at 9.)

9          The October 15, 2003 incident report signed by Correctional Lt. R. Clayton,

10  reflects that

11          at approximately 1456 hours, a Riot involving Hispanic and White
        inmates occurred on the Main Yard of Folsom Prison.  The Riot

12          resulted in the discharge of seven (7) 40 mm Exact Impact rounds,
        two (2) 40 mm C/N "Skat" rounds, the use of a Side Handle Baton

13          and Oleoresin Capsicum (O/C) Pepper Spray, to contain the
        incident.  A Code 3 response was announced and responding staff

14          utilized verbal commands to keep the inmates down on the ground.
        The inmates identified as being involved in the Riot were

15          medically reviewed, and placed in Administrative Segregation.

16  (Defts.' Ex. B, at 1.)  C. Gibson's incident report confirmed that the initial fight triggered a Code

17  1 alarm, but that at about 1515 hours "a large riot of approximately 100 inmates comprised of

18  Southern Hispanics and White Inmates began fighting." (Defts.' Ex. B, at 13.)

19          In his incident report, defendant Martinez stated he was supervising the 1500 hour

20  mandatory yard recall when he first heard the code 1 alarm.  (Defts.' Ex. B, at 15.)  "The Radio

21  Transmission requested Code 1 Responders to assemble on the main yard near the yard shack."

22  (Id.)  He reported that the initial four inmates who had been fighting got down when ordered to

23  do so.  (Id.)  At about 1515 hours, defendant Martinez noted that the inmates were ordered to

24  remain in the down position until staff cleared them to return to their housing units.  (Id. at 16.)

25          Defendant Martinez stated that at about 1520 hours he "started instructing small

26  groups of inmates (25) to stand up and slowly return off the yard." (Id.)  About "five minutes

1    into processing inmates off the yard, another Code 2 alarm [came] over the radio . . . and [he]

2    observed multiple inmates fighting, approximately 20." (Defs.' Ex. B at 16.)  Defendant

3    Martinez noted that he "immediately requested Code 2 back up.  [He] then heard a radio

4    transmission requesting Code 3." (Id.)

5            The declaration of D. Elledge, Correctional Captain assigned to the Emergency

6    Operations Unit in Sacramento, provides that "[w]hen an incident occurs that involves inmate

7    violence, the first staff member who observes an incident determines the level of response

8    needed to control the incident and calls a "code" [that] corresponds with that level of response."

9    (Elledge Decl., at 1-2, Defts.' Ex. C.)  Captain Elledge further stated that the October 15, 2003

10   incident "began with a fight involving four inmates and a Code 1 response was called.  That is

11   the appropriate code to call for such an incident."   (Id. at 2.)  "After that incident was controlled,

12   a second incident occurred that initially involved more than 20 inmates, and that quickly

13   escalated to an incident involving approximately 100 inmates at several locations on the main

14   exercise yard.  A Code 2 was called that was shortly followed by a Code 3.  Those are the

15   appropriate codes for the incident." (Id.)

16           Plaintiff alleges that Sgt. Martinez "failed in his responsibility to realize that

17   Caucasian and Hispanic inmates' fighting was (historically) racial and by raising the yard

18   allowed a Code 2 riot to occur." (Compl. at 5.)  Liberally construed, however, plaintiff contends

19   Sgt. Martinez prematurely raised the yard, placing plaintiff at risk as plaintiff had just walked

20   through the area where Hispanics and Caucasians were fighting and plaintiff was a Caucasian.

21   Defendant Martinez has not provided a declaration or other explanation as to how he determined

22   it was appropriate to raise the yard; that is, that the fight among the four inmates had quieted such

23   that the inmates could be raised and returned to their housing units.

24           However, defendant Martinez has presented evidence that he was not the officer

25   who witnessed the initial altercation among the four inmates or who sounded the first Code 1

26   alarm.  He heard the initial Code 1 over the radio.  Plaintiff has provided no evidence in rebuttal

and has not demonstrated that there was additional information available to defendant Martinez

that would have put him on notice that a full-blown riot was percolating while the inmates were

down.  The record does reflect that once the initial four inmates were ordered to get down, they

complied.  This evidence provides no hint of the riot to come.  Rather, all of this evidence

demonstrates that defendant Martinez was personally unaware of the risk.  <u>Farmer</u>, 511 U.S. at

844.  Plaintiff has failed to produce any inmate declaration, affidavit, or other evidence

demonstrating that defendant Martinez was deliberately indifferent.  Therefore, the evidence

before the court fails to demonstrate a genuine dispute about whether defendant Martinez was

deliberately indifferent to plaintiff's safety when he began ordering small groups of inmates to

rise and return to their housing units.

Plaintiff provides no evidence that defendant Martinez was aware that a riot was

about to begin, other than to suggest that because riots have broken out between Caucasians and

Hispanics in the past, Sgt. Martinez should have known such a riot would occur by raising the

yard after the initial fight.  Such historical context, without more, is insufficient to demonstrate

defendant Martinez was culpable under the Eighth Amendment.  Moreover, defendant Martinez

immediately returned to the yard and attempted to quell the riot by using pepper spray.  Plaintiff

has not rebutted that evidence.

Plaintiff contends defendant Martinez "showed negligence by failing to control

inmates." (Compl. at 5.)  Under a simple negligence standard, reasonable minds might debate

whether defendant Martinez began releasing inmates too early or in too large a number (25).  But

this Eighth Amendment claim is viewed under a deliberate indifference standard.  Thus, while

one might in hindsight second-guess the decision by defendant Martinez to begin releasing

inmates back to the housing unit was premature, on this record it cannot reasonably be said that

the release was a deliberate and indifferent decision to act against plaintiff's personal safety.  It

was the opposite.  The evidence reflects that the initial four inmates immediately complied with

the orders to get down and they were provided medical care without incident.  Plaintiff has

1   pointed to no signs or other events that occurred between the orders to get down and the orders to

2   start releasing small groups of inmates back to their housing units that would have put defendant

3   Martinez on notice of the impending riot.  Unfortunately, plaintiff was one of the first inmates to

4   be attacked as the inmates erupted into a riot.  But, on this record, defendant Martinez acted

5   reasonably and a reasonable jury could not rationally find that he acted with deliberate

6   indifference by releasing the inmates prematurely.  Therefore, defendant Martinez is entitled to

7   summary judgment.

8           Plaintiff also contends that Cadet Officers Navarro and Milson failed to aid

9   plaintiff after he was kicked in the head and failed to provide control and safety of inmates.

10  (Compl. at 7, 10.)  Defendants have provided evidence that Cadet Officers Navarro and Milson

11  were assigned to accompany correctional officers that day and observe them performing their

12  jobs.  (Defs.' Ex. C.)  Neither defendant was cleared to use or carry weapons, and neither had a

13  side-handle baton, pepper spray, or other weapon that day.  (Id.)  When the violence erupted,

14  defendant Milson ordered the inmates to get down.  It is undisputed that there were about 40

15  inmates involved in mutual combat.  (Compl. at 10.)  Plaintiff offers no evidence to support his

16  theory that defendants Milson and Navarro should have taken some other steps to control the

17  inmates or come to plaintiff's aid.  Given their lack of weapons, the most defendants Milson and

18  Navarro could have done was order the inmates to get down.  Plaintiff has failed to demonstrate

19  that defendants Navarro and Milson were deliberately indifferent to plaintiff's safety or

20  deliberately failed to aid plaintiff.

21          Plaintiff has failed to demonstrate the existence of a genuine issue of material fact

22  concerning the subjective element of his Eighth Amendment claim.  In the absence of any

23  evidence that defendant knew of and disregarded an excessive risk to plaintiff's safety on

24  October 15, 2003, the undersigned finds that no rational trier of fact could find that defendants

25  had a sufficiently culpable state of mind.  Plaintiff's failure of proof concerning the subjective

26  element of his claim renders all other facts, as well as any disputes concerning those facts,

1  immaterial.  Summary judgment should be entered for defendants Butler, Martinez, Navarro and

2  Milson on this claim.

3          In light of the determination that defendants are entitled to judgment in their favor

4  on the merits of plaintiff's claims, it is unnecessary to consider defendants' argument in the

5  alternative that they are entitled to qualified immunity.

6   2.  Deliberate Indifference to Serious Medical Needs

7          Plaintiff claims defendants Butler, Gaitonde, Torruella, Cardeno, Dazo, Davis,

8  Stahl, Grannis, and Leichner were deliberately indifferent to his serious medical need for

9  treatment of injuries sustained during a prison riot.

10          In order to prevail on his Eighth Amendment claim plaintiff must prove that he

11 had a "serious medical need" and that defendants acted with "deliberate indifference" to that

12 need.  Estelle v. Gamble, 429 U.S. 97, 105 (1976).  A medical need is serious if "the failure to

13 treat a prisoner's condition could result in further significant injury or the 'unnecessary and

14 wanton infliction of pain.'"  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir.1992) (quoting

15 Estelle, 429 U.S. at 104).  Deliberate indifference is proved by evidence that a prison official

16 "knows of and disregards an excessive risk to inmate health or safety; the official must both be

17 aware of the facts from which the inference could be drawn that a substantial risk of serious harm

18 exists, and he must also draw the inference."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).

19 Mere negligence is insufficient for Eighth Amendment liability.  Frost v. Agnos, 152 F.3d 1124,

20 1128 (9th Cir. 1998).

21          Whether a defendant had requisite knowledge of a substantial risk is a question of

22 fact and a fact finder may conclude that a defendant knew of a substantial risk based on the fact

23 that the risk was obvious.  Farmer, 511 U.S. at 842.  While the obviousness of the risk is not

24 conclusive, a defendant cannot escape liability if the evidence shows that the defendant merely

25 refused to verify underlying facts or declined to confirm inferences that he strongly suspected to

26 be true.  Id.  Deliberate indifference specifically to medical needs "may be shown by

1   circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually

2   knew of a risk of harm."  Lolli v. County of Orange, 351 F.3d 410, 421 (9th Cir. 2003).

3          "Prison officials are deliberately indifferent to a prisoner's serious medical needs

4   when they deny, delay, or intentionally interfere with medical treatment."  Hallett v. Morgan, 296

5   F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted).  However, delay

6   in providing medical treatment to a prisoner does not constitute deliberate indifference unless the

7   delay causes substantial harm.  Shapely v. Nevada Bd. of State Prison Com'rs, 766 F.2d 404 (9th

8   Cir. 1985).  Additionally, "a plaintiff's showing of nothing more than 'a difference of medical

9   opinion' as to the need to pursue one course of treatment over another [is] insufficient, as a

10  matter of law, to establish deliberate indifference."  Jackson v. McIntosh, 90 F.3d 330, 332 (9th

11  Cir. 1996) (as amended) (1996).  In order to prevail on a claim involving choices between

12  alternative courses of treatment, a plaintiff must show that the course of treatment the doctors

13  chose was medically unacceptable under the circumstances and that they chose this course in

14  conscious disregard of an excessive risk to the plaintiff's health.  See Toguchi v. Chung, 391 F.3d

15  1051, 1058 (9th Cir.2004); Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir.1996) (citing Farmer,

16  551 U.S. at 837), cert. denied, 519 U.S. 1029 (1996).

17          a. Dr. Gaitonde

18          Initially, plaintiff states that Dr. Gaitonde

19          allegedly saw [plaintiff] on the day of the riot.  It is common
20          knowledge that the doctors leave the grounds by 1435 hours and do
            not take patients after 1300 hours.  If she did see [plaintiff], she
21          failed to make any notes in his file . . . and did not send him to a
            hospital for more advanced attention than what was available in the
22          clinic.  Yet inmate Small was sent to a hospital for a bruise under
            his eye by an MTA.  Seeing [plaintiff] several weeks later, [Dr.
23          Gaitonde] made the comment, "So, he's the one who started the
            riot."  MTA Davis said to her, "ya, he was the one in the fetal
24          position."  [Dr. Gaitonde] had never seen [plaintiff] before.  Dr.
            Gaitonde failed in her duties and was negligent as doctor and
25          displayed deliberate indifference to this patient.

26  (Compl. at 3, citing Attachment A.)  Later, plaintiff alleges that MTA Beruth was the attending

MTA in the prison clinic, and MTA Beruth noted plaintiff was seen by Dr. Gaitonde.  (Compl. at 5.)  Plaintiff appended a copy of the "Report of Injury or Unusual Occurrence" signed by MTA Beruth, noting plaintiff was seen by Dr. Gaitonde.  (Compl., Attach. A.)  Plaintiff complains that his return to custody within twenty-five minutes was negligent and demonstrated deliberate indifference.  (Compl. at 5.)  Plaintiff appears to contend that Dr. Gaitonde was deliberately indifferent because he failed to send plaintiff to the hospital for x-rays and an MRI.

It is undisputed that plaintiff was removed from the scene on a gurney.  However, the October 15, 2003 medical record reflects plaintiff had multiple abrasions, a swollen lip, and bruises on his head, but that no dressings were required for the abrasions.  (Compl., Attach. A.)  There is no indication on that form that plaintiff had a broken bone or required an MRI.  During the exam plaintiff stated he didn't know what happened.  (Compl., Attach. A.)

This record does not demonstrate deliberate indifference on the part of Dr. Gaitonde.  To the extent plaintiff disagrees with the initial treatment provided by Dr. Gaitonde, such disagreement does not demonstrate deliberate indifference.  Jackson v. McIntosh, 90 F.3d at 332.  To the extent plaintiff contends Dr. Gaitonde was negligent in her treatment or lack of treatment of plaintiff, such claim is insufficient for Eighth Amendment liability.  Frost, 152 F.3d at 1128.

b.  Dr. Torruella

As to defendant Torruella, plaintiff alleges there was "no follow through on Dr. Torruella's prescriptions for diagnostic procedures for [plaintiff] and no follow through by this doctor."  (Complt. at 4.)

Medical records reflect that defendant Dr. Torruella first examined plaintiff on October 23, 2003 at the request of the warden, defendant Butler.  Dr. Torruella wrote:

> Pt recalls he was on the yard walking, remembers a bell alarm about 2 o'clock going off and he sat down and some one hit him on the head with a milk crate.  He does not remember getting up – remembers he was in a holding cell.  Says this was a 6 or 7 hour interval.  This happened 1 week ago!  10/15/03

> Since 10/18/03 - has improved his memory but remembers he sent a letter to his mother and his girlfriend on 10/19/03.
>
> Now "my head hurts behind my eyes and temple.["] [¶]  No change in vision.  [¶]  Right ear canal hurts – dizzy with movement.  [¶]  Full range of motion of his extremities.  [¶]  Gait OK.
>
> Head pain rated as an 8 - pounding head.  [¶]  Was helped by Motrin.
>
> Neck - is stiff and is cracking.  [¶]  When tilts head to left pain goes to spine.

(Defs.' Ex. A, Attach. 2 at 10.)  Dr. Torruella spoke with the medical technical assistant

("MTA") who attended plaintiff for fifteen minutes or so after the assault.  (Id. at 11.)  The MTA

said plaintiff "was kicked several times in the head when he was down and for this period of time

[plaintiff] was aware of who he was but not where he was and his pupils were equal but reacted

sluggish."  (Id.)

Upon examination, Dr. Torruella's objective findings were that plaintiff was

oriented times three; his head, eyes, ears, nose and throat were normal; his abrasions had mostly

healed; his neck had full range of motion; he was clear to auscultation; his chest was clear; he

was negative for Trendelenburg; his pupils were round, regular and equal and reacted to light and

accommodation and pupil size changes.  (Id.)

Dr. Torruella's assessment of plaintiff was "head trauma syndrome with ? Loss of

consciousness times two days?"  [¶]  Rule out jaw fracture or dislocation."  (Id.)  Dr. Torruella's

treatment plan included x-rays of plaintiff's "mandibles TMJ" (temperomandibular joint) and an

MRI of the brain.  (Id.)  Dr. Torruella wrote an order for the mandibular x-rays on that same day.

(Defs.' Ex. A, Attach. 2 at 22.)  Dr. Torruella did not write an order for the MRI.  Rather, it

appears plaintiff was referred to Dr. Cardeno, who performed a neurological exam of plaintiff

and found no gross deficit.  (Defs.' Ex. A, Attach. 2, at 11.)

/////

/////

24

1          Five views of plaintiff's mandible area were x-rayed on October 23, 2003.  (Defs.

2  Ex. A, Attach. 2, at 27.  Dr. Mukuno noted that plaintiff's mandible was intact, with no acute

3  fractures or destructive changes, and that the mandible was otherwise unremarkable.  (Id.)

4          Plaintiff refused the follow-up medical appointment scheduled for November 5,

5  2003, but on November 12, 2003, plaintiff was seen by Dr. Dazo who noted there was no

6  evidence of any residual effects from the head trauma. (Defs.' Ex. A, Attach. 2 at 12.)  Plaintiff

7  was seen again on December 8, 2003 by Dr. Gaitonde to have his ear checked; Dr. Gaitonde

8  ordered plaintiff's right ear cleaned of ear wax.  On December 31, 2003, Dr. Torruella received a

9  phone call from plaintiff's girlfriend who claimed plaintiff's eyes looked funny and raised the

10  question of a detached retina. (Defs.' Ex. A, Attach. 2, at 16.)  The Chief Medical Officer

11  requested plaintiff be seen promptly.  (Id.)  Dr. Gaitonde saw plaintiff that day and noted

12  plaintiff's pupils were equal, reacting to light, and plaintiff had vision of 20/30 in both eyes. (Id.)

13  Dr. Gaitonde ordered that plaintiff be seen by an optometrist to rule out refractive error as soon

14  as possible.  (Id., at 16, 24.)  Dr. Gaitonde explained this treatment plan to plaintiff and noted he

15  would discuss this case with the Chief Medical Officer.  (Id. at 16.)

16          Dr. Torruella saw plaintiff again on January 30, 2004.  (Defs.' Ex. A, Attach. 2, at

17  17.)  Plaintiff complained his eyes blurred when reading print with both eyes, and stated he

18  thought his visual problems related to his head injury in 2003, which he noticed two to three

19  weeks after the injury.  (Id.)  Plaintiff stated his vision was becoming worse; that when he turns

20  off the light, he gets red and green pixels in both eyes and twirling movements.  (Id.)  Dr.

21  Torruella noted this was "non objective."  (Id.)  Plaintiff complained that his right ear continued

22  to hurt and that when he burps he hears a sound in his right ear.  (Id.)  Plaintiff denied feeling

23  dizzy, but stated he had been dizzy in the past.  (Id.)  Plaintiff also complained of continuing

24  neck and back pain and reported his girlfriend said he had a round ring around his cornea.  (Id.)

25  /////

26  /////

1   Dr. Torruella examined plaintiff and noted plaintiff's pupils were round, regular,

2   and equal, and that they reacted to light, accommodation, and pupil size changes. (Id.) Dr.

3   Torruella ordered an audiogram and expedited eye examination. (Id.)

4   Plaintiff was seen by an optometrist on February 3, 2004. (Defs.' Ex. A, Attach.

5   2, at 24.) The optometrist noted the following impressions: "hyperopic astigmatism/Presbyopia[4]

6   - no ocular effects from trauma - no neurological signs today. Patient declines prescription for

7   glasses. Wants to buy soda." (Id.) On March 4, 2004, plaintiff presented at mental health,

8   complaining of problems with his ear and nose and stating he was "fearful and traumatized" as a

9   result of the riot. (Defs.' Ex. A, Attach. 2, at 19.) The psychiatric social worker noted that

10   plaintiff suffered some paranoid ideation secondary to trauma of closed head injury and

11   diagnosed plaintiff as suffering from post traumatic stress disorder. (Id.) No follow-up was

12   ordered.

13   It is undisputed that no audiogram was performed prior to plaintiff's parole on

14   March 24, 2004. Although plaintiff returned to prison on May 6, 2005, he was not returned to

15   Folsom State Prison. (Defs.' Ex. A, Attach. 1 at 9-11.) Plaintiff was released on parole again on

16   November 6, 2006. (Defs.' Ex. A, Attach. 1 at 11.)

17   The above record does not demonstrate that Dr. Torruella was deliberately

18   indifferent to plaintiff's serious medical needs. Dr. Torruella examined plaintiff and ordered

19   medical tests he felt appropriate. Although Dr. Torruella indicated an MRI should be performed

20   on plaintiff's brain, plaintiff was subsequently seen by Dr. Cardeno who performed a

21   neurological exam and determined plaintiff suffered no gross neurological defects. Plaintiff has

22   provided no evidence to contradict this finding. When Dr. Torruella subsequently saw plaintiff

23   /////

24

25   [4] Hyperopic, pertaining to hyperopia, which means farsightedness. STEDMAN'S MEDICAL

26   DICTIONARY 742 (25th ed. 1990). Presbyopia means "the physiological loss of accommodation in the eyes in advancing age." Id. at 1254.

26

1  on January 30, 2004, he did not find it necessary to order an MRI, focusing instead on plaintiff's

2  ear complaints and referring plaintiff for an expedited eye exam by an optometrist.

3         The fact that Dr. Torruella decided plaintiff should have an MRI of the brain

4  while Dr. Cardeno found plaintiff suffered no neurological defects and therefore did not require

5  an MRI does not constitute deliberate indifference.  Jackson, 90 F.3d at 332.   Plaintiff has failed

6  to demonstrate that the course of treatment subsequent doctors chose was medically unacceptable

7  or that they chose the course in conscious disregard of an excessive risk to his health.  See

8  Toguchi, 391 F.3d at 1058.  As to the delay in obtaining the audiogram, the audiogram was

9  ordered on January 30, 2004 and plaintiff paroled on March 24, 2004.  As noted above, delay in

10  providing medical treatment to a prisoner does not constitute deliberate indifference unless the

11  delay causes substantial harm.  Shapely v. Nevada Bd. of State Prison Com'rs, 766 F.2d 404 (9th

12  Cir. 1985).  Plaintiff has not provided any evidence that the delay caused him substantial harm.

13  Accordingly, defendant Torruella is entitled to summary judgment.

14         c.  Dr. Dazo

15         Plaintiff states Dr. Dazo "allegedly interviewed" plaintiff.  (Compl. at 4.)  Plaintiff

16  claims he was

17         under the impression that Dr. Dazo was another medical visit.  He
        had no idea that he was being interviewed and that he had to be
18         responsive regarding his medical needs.  Dr. Dazo showed
        negligence in his interviewing technique if [plaintiff] was so ill that
19         he was unaware of the interview situation.

20  (Compl. at 4.)  There are no other charging allegations against defendant Dazo in plaintiff's

21  complaint.

22         Medical records reflect plaintiff was first seen by Dr. Dazo on October 22, 2003.

23  Plaintiff complained he had been hit on the head with a milk crate and had been unconscious in

24  his cell for two days and wanted pain medication.  (Defs.' Ex. A, Attach. 2, at 4.)  Dr. Dazo

25  examined plaintiff, noted no objective findings, reported that plaintiff's eyes, ears, nose and

26  throat (EENT) were benign, no abnormalities were found after review of plaintiff's system, and

1  plaintiff's vital signs were stable.  (Id.)  Dr. Dazo's assessment was no residual physical or

2  neurological abnormalities as a result of plaintiff's injuries, and the noted treatment plan was

3  "reassurance."  (Id.)

4  Dr. Dazo saw plaintiff again on November 12, 2003, for follow-up and review of

5  plaintiff's administrative grievance.  (Defs.' Ex. A, Attach. 2, at 12; Defs.' Ex. E, Attach. I.)  Dr.

6  Dazo noted plaintiff "needs refill of Motrin for musculoskeletal pain" and recent head trauma.

7  (Defs.' Ex. A, Attach. 2, at 12.)  Dr. Dazo reported no evidence of any residual effects from the

8  head trauma and renewed plaintiff's prescription for Motrin.  (Id.)

9  This record, without more, fails to demonstrate Dr. Dazo was deliberately

10  indifferent to plaintiff's serious medical needs.  Rather, the records reflect plaintiff was examined

11  twice by Dr. Dazo and both examinations revealed no residual effects from the head trauma.

12  Although it appears plaintiff disagrees with this conclusion, a difference of opinion as to

13  appropriate medical care does not give rise to a § 1983 claim.  Franklin v. Oregon, 662 F.2d

14  1337, 1344 (9th Cir. 1981).  Mere negligence is also insufficient for Eighth Amendment liability.

15  Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

16  d.  Dr. Cardeno

17  Plaintiff alleges Dr. Cardeno

18  saw [plaintiff] and simply told him he would be seen that evening
   and next week if needed.  [Plaintiff] suffered from symptoms
19  severe head trauma and other injuries.  He was not seen that
   evening or a week later by Dr. Cardeno, and Dr. Torruella's orders
20  were not carried out.  Dr. Cardeno failed in his duties and showed
   deliberate indifference when it was known that medical care was
21  needed.

22  (Compl. at 4, citing Attachment B.)  There are no other charging allegations within the complaint

23  as to defendant Cardeno.

24  Written on Dr. Torruella's Progress Notes, by the suggested treatment "MRI

25  Brain," is a note by Dr. Cardeno stating:  "explained to patient he will be seen p.m. and next

26  week and if needed to do further studies will do so.  Neuro - no gross deficit."  (Compl.,

1  Attachment B; Defs.' Ex. A, Attach. 2 at 11.)  Dr. Cardeno ordered Naprosyn, 500 mg., b.i.d. as

2  needed for seven days, and Robaxin, 750 mg., t.i.d. for seven days, and was marked "STAT."

3  (Defs.' Ex. A, Attach. 2 at 22.)

4          Although Dr. Cardeno stated plaintiff would be seen, it was qualified by the

5  language "if needed."  Plaintiff has provided no evidence that he later presented for or requested

6  medical treatment.  Defendants, on the other hand, have presented evidence that on November 5,

7  2003, plaintiff refused to be seen.  (Defs.' Ex. A, Attach. 2, at 12.)  Moreover, there is undisputed

8  evidence that plaintiff was later seen by Dr. Dazo and Dr. Gaitonde.  Plaintiff has failed to

9  provide evidence that he needed to be seen and was not, or that his medical condition required an

10  MRI, particularly in light of Dr. Cardeno's finding that there was no gross deficit on October 23,

11  2005.  On this record, the court cannot find that Dr. Cardeno was deliberately indifferent to

12  plaintiff's serious medical needs.

13          e.  Defendant Davis

14          Plaintiff alleges

15          MTA Davis know of the neglect to [plaintiff].  He made the
        comment when [plaintiff] asked about what had happened to him,
16      that [plaintiff] "better not ruin his life by naming him in a lawsuit."
        He also made the comment to Dr. Gaitonde that "[plaintiff] was the
17      one in a fetal position."  It was his responsibility, by job definition,
        to make sure [plaintiff] got the proper attention.  Deliberate
18      indifference as well as negligence.

19  (Compl. at 6.)  Even assuming, *arguendo*, that defendant Davis made the statements attributed to

20  him, such statements do not demonstrate deliberate indifference because it is undisputed that

21  plaintiff was seen by Dr. Gaitonde that day.  (Compl., Attach. A; Defs.' Ex. A, Attach. 2, at 9,

22  21.)  Plaintiff has provided no authority to suggest that defendant Davis had the authority to

23  override Dr. Gaitonde's decision to release plaintiff back to custody rather than refer him to a

24  hospital for further treatment.  Moreover, negligence is insufficient for Eighth Amendment

25  liability.  Frost, 152 F.3d at 1128.  Defendant Davis is entitled to summary judgment.

26  /////

f.  Defendant Stahl

Defendant Stahl was an MTA who performed triage after the riot.  Plaintiff's sole allegations as to this defendant read as follows:

> Why did he not see how badly hurt [plaintiff] was, bleeding and delirious, in and out of consciousness?  [Plaintiff] was the only inmate taken off the yard on a litter, non-ambulatory.  Why did he not send [plaintiff] to the hospital while sending inmate R. SMALL . . . to an off-site hospital for a bruise under his eye?  This is another case of deliberate indifference and negligence.

(Compl. at 6, citing Attach. C.)

However, it is undisputed that plaintiff was sent to the medical clinic where he was evaluated by another MTA and seen by Dr. Gaitonde.  Defendant Stahl's actions of sending plaintiff to the clinic rather than to a hospital do not constitute deliberate indifference.  In addition, plaintiff has provided no authority to suggest that defendant Stahl had the authority to override Dr. Gaitonde's decision to release plaintiff back to custody rather than refer him to a hospital for further treatment.  Defendant Stahl is entitled to summary judgment.[5]

g.  Defendant Warden Butler

Plaintiff alleges defendant Butler was deliberately indifferent to his serious medical needs.  It is undisputed that defendant Butler did not become aware of plaintiff's injuries until October 23, 2003, seven days after the riot.  (Compl. at 11.)  It is also undisputed that at the hearing, plaintiff informed defendant Butler about plaintiff's injuries and that defendant Butler stated plaintiff would "see a doctor immediately."  (Compl. at 11.)  Plaintiff provided a copy of physician's notes reflecting that plaintiff was seen by Dr. Torreulla on October 23, 2003, pursuant to warden referral.  (Compl., Attach. I.)  Plaintiff states that "the remaining time of [his]

---

[5]  The only evidence presented as to inmate Small is a copy of the report of injury form completed by defendant Stahl.  (Comp. at Attach. C.)  This form does not indicate whether inmate Small was first taken to the clinic or was first or later taken to the hospital.  The form notes inmate Small was seen at 1505, and the disposition portion states "1410 RTC."  (Id.)  However, because plaintiff was seen in the clinic by MTA Davis and Dr. Gaitonde, the treatment of inmate Small, without more, is not that relevant.

1  sentence [he] did not receive an MRI or audio tests per [defendant] Butler's orders." (Compl. at

2  11.)  However, plaintiff did not provide evidence that defendant Butler ordered plaintiff to

3  receive an MRI or audio tests.  Rather, it is undisputed that defendant Butler told plaintiff he

4  would see a doctor immediately and it is undisputed that plaintiff was seen by Dr. Torreulla that

5  same day.  This record demonstrates that defendant Butler was attentive to plaintiff's serious

6  medical needs and ensured that he was seen by a doctor that day.  Defendant Butler is entitled to

7  summary judgment.

8           h.  Defendant Leichner

9           Plaintiff contends that defendant Leichner, a parole agent, should have helped

10  plaintiff obtain medical attention while plaintiff was on parole.  However, defendants are correct

11  that the state is under no obligation to provide medical care to a parolee because he is no longer

12  incarcerated and unable to provide for his own care.  See DeShaney v. Winnebago County Dept.

13  of Social Services, et al., 489 U.S. 189, 198-200 (1989).  Obligations under the Eighth

14  Amendment only arise during plaintiff's incarceration.  Because plaintiff was free to seek

15  medical care while on parole, defendant Leichner cannot be held liable under the Eighth

16  Amendment.

17           Plaintiff also alleges he was not provided G.A.T.E. money upon his release on

18  parole.  However, the alleged failure to provide this money does not state a claim under 42

19  U.S.C. § 1983.  See Campbell v. Burt, 141 F.3d 927, 930 (9th Cir. 1998)(violation of state law

20  does not state constitutional claim under § 1983).  Accordingly, defendant Leichner is entitled to

21  summary judgment on this claim as well.

22           i.  Defendant Grannis

23           Plaintiff also contends defendant Grannis was deliberately indifferent to plaintiff's

24  serious medical needs by denying plaintiff's grievance complaining about his medical treatment.

25  However, in light of the above findings that physicians determined plaintiff's care was

26  /////

1    appropriate, this court cannot find that defendant Grannis was deliberately indifferent to

2    plaintiff's serious medical needs.

3    3. Defendant Pagala

4              Plaintiff states that defendant M. Pagala "showed negligence by failing to look at

5    evidence submitted by [plaintiff] and showed deliberate indifference in this matter when medical

6    diagnostic procedures were warranted." (Compl. at 7.) Plaintiff claims the "denial of the final

7    602 was heard on behalf of the Chief of Inmate Appeals, M. PAGALA, OT APPEALS,

8    "PAGALA," by the same staff who denied [plaintiff] medical attention at the time of [his]

9    original injuries." (Compl. at 11.) However, the Director's Level Appeal Decision, rendered

10   May 11, 2004, reflects that N. Grannis signed plaintiff's appeal. (Compl., Attachment K.) That

11   decision reflects that Facility Captain Porter interviewed plaintiff at the Director's level review.

12   (Id.) Plaintiff has provided no evidence to support his claim that defendant Pagala was involved

13   in the grievance procedure or acted with deliberate indifference to his serious medical needs. In

14   addition, in light of the above findings that physicians determined plaintiff's care was

15   appropriate, this court cannot find that defendant Pagala was deliberately indifferent to plaintiff's

16   serious medical needs. Accordingly, defendant Pagala is also entitled to summary judgment.

17            IT IS HEREBY ORDERED that plaintiff's request for Fed. R. Civ. P. 56(f)

18   continuance is denied.

19            In light of the above, IT IS HEREBY RECOMMENDED that defendants'

20   December 13, 2006 motion for summary judgment be granted.

21            These findings and recommendations are submitted to the United States District

22   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty

23   days after being served with these findings and recommendations, any party may file written

24   objections with the court and serve a copy on all parties. Such a document should be captioned

25   "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that

26   /////

1  failure to file objections within the specified time may waive the right to appeal the District

2  Court's order.  Martinez v. Ylst, 95 1 F.2d 1153 (9th Cir. 1991).

3  DATED:  May 17, 2007.

4

5                                        UNITED STATES MAGISTRATE JUDGE

6

7  /001; sisc0867.msj

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26